NOT FOR PUBLICATION

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

|  |  |
|---|---|
| TRIMENSA CORPORATION *et al.,* | ) ) ) ) |
| Plaintiff, | ) ) |
| v. | ) ) |  Civil Action No. 05-2814 (SRC) |
| ANSELL HEALTHCARE PRODUCTS, LLC | ) )  **OPINION** |
| Defendant. | ) ) ) |

## CHESLER, District Judge

**THIS MATTER** comes before the Court on a Motion for a Preliminary Injunction with Temporary Restraints by Plaintiff Trimensa Corporation (Docket Entry # 6).  The Court, having considered the papers submitted by the parties, and having heard from each of the parties at oral argument, for the reasons set forth below, and for good cause shown, **denies** Plaintiff's Motion.

### I. Procedural Background

On May 31, 2005, Trimensa Corporation ("Trimensa") filed a complaint against Ansell Healthcare Products, LLC ("Ansell"), charging them with trademark infringement and unfair competition under federal, state, and common law.  On July 20, 2005, Trimensa made a motion for a preliminary injunction against Ansell, seeking to enjoin Ansell's use of the "4PLAY BY

LIFESTYLES" mark, which Ansell had been using since March 2005 to brand their new line of pre-packaged condoms and accessories.[1]  Trimensa alleges that Ansell's use of the "4PLAY BY LIFESTYLES" mark infringes on Trimensa's federally registered trademark "FORPLAY SENSUAL LUBRICANTS" and associated design,[2] which it has used since 1980 to market its line of personal lubricants.  The Court has jurisdiction over this controversy pursuant to 28 U.S.C. §§ 1331 and 1332.  The findings and conclusions set forth in this opinion are preliminary only, based upon the state of the record at this stage in the litigation.  See Fed.R.Civ.P. 65(a). The parties have preserved all rights to present their disputes to a fact-finder for eventual adjudication on the merits.

## II. Findings of Fact

A.    Trimensa Corporation - Plaintiff

Plaintiff Trimensa, a California corporation, has been in operation for twenty five years. (Pl. Br. at 2.)  Since November 1980, Trimensa has marketed personal lubricants under the brand name "ForPlay Sensual Lubricants."  (Id.)  On August 5, 1986, the United States Patent and Trademark Office ("PTO") granted trademark registration to Trimensa for the "FORPLAY SENSUAL LUBRICANT" mark and associated design, for use on "lubricant[s] for sexual purposes."  (Compl. at Tab 1.)

In addition to personal lubricants, Trimensa currently markets other products, including spermicides, contraceptive preparations, vaginal moisturizer, and a detergent for cleaning adult,

---

[1]    Ansell filed a trademark application for "4PLAY BY LIFESTYLES" on November 2, 2004, seeking to register both of these marks in Class 10, which includes, among other things, medical apparatus and hygenic rubber articles, such as condoms.  (Def. Br. at 8-9)

[2]    U.S. Registration No. 1,403,725, issued August 5, 1986.  (Compl. at Tab 1.)

sexual toys, under the "FORPLAY" name. (Pl. Br. at 2.)  Trimensa does not currently market condoms (Tr. at 8, lines 9-11.)  However, they note that they are preparing to introduce a line of condoms, also under the "FORPLAY" name, but have delayed this product launch due to this litigation.  (Id., lines 12-13.)  (See also Pl. Br. at 2.)  In September 2004, Trimensa submitted Application No.76/612,495 for trademark registration of the "FORPLAY" mark for use on personal lubricants, spermicides, contraceptive preparations, and vaginal moisturizer.  (Pl. Br. at 4-5.)  This application has been published for opposition by the PTO. (Id.)

B.    Ansell Healthcare Products, LLC - Defendant

Defendant Ansell, a Delaware company, with a principal place of business in New Jersey, (Compl. at 2), has been in business for one hundred years.  (Def. Br. at 6.)  Ansell is a distributor of surgical, examination, and occupational gloves, but is perhaps best known for its line of condoms marketed under the "LIFESTYLES" brand name.[3]  (Id.)  Ansell owns several federally registered trademarks, including the federally registered "LIFESTYLES" mark.  (Id.)

In 2000, Ansell also began marketing personal lubricants under its "LIFESTYLES" brand.[4]  (Pl. Br. at 5.)  In October 2004, Ansell began developing a new extension to their current product line, combining condoms with other sexual accessories, such as lubricants, massage oils, etc., to be marketed as pre-packaged 'kits' to the consumer.  (Def. Br. at 8.)  In March 2005, this new product line was launched under the name "4PLAY BY LIFESTYLES."  (Id.)

_____

[3]      Ansell's 2001 worldwide sales for its "LIFESTYLES" brand condoms were $115 million, representing 12% of worldwide share in the condom market.  (Pl. Br. at 33.)

[4]      Since January 2001, Ansell has held a registered trademark for the name "LIFESTYLES" for use on "gels used as personal lubricant."  (Compl. at App. D (copy of U.S. Registration No. 2,425,097))

In November 2004, Ansell filed applications with the PTO to register the marks "4PLAY" and "4PLAYBYLIFESTYLES." (Pl. Br. at 5.) In April 2005, Trimensa sent a letter to Ansell, claiming that a likelihood of confusion exists between the marks "FORPLAY" and "4PLAY" and requesting that Ansell withdraw its trademark applications. (Id. at 5-6.) On May 17, 2005, after Ansell launched their products under the name "4PLAYBYLIFESTYLES," Trimensa's counsel sent another letter demanding that Ansell cease use of the term "4PLAY" in their product branding. (Id. at 6.) On May 26, 2005, Ansell abandoned its application to register "4PLAY" and amended its application to space the wording to register "4PLAY BY LIFESTYLES." (Id.)

C.     The Marketplace for Ansell and Trimensa's Products

Personal lubricants and condoms have a close relationship in the marketplace, since they are often used together. (Pl. Br. at 3.) The close relationship between these products is further highlighted by Trimensa's marketing of their lubricants as "condom compatible," as well as the fact that Ansell sells both condoms and personal lubricants under its "LIFESTYLES" brand. (Id.)

Trimensa markets its products under the "FORPLAY SENSUAL LUBRICANTS" name at retail outlets that market adult-oriented products. (Pl. Br. at 4.) Trimensa also distributes its products through Walgreens, a national drug store chain. (Id.) To promote its products, Trimensa uses a limited advertising budget, relying primarily on "word of mouth" to develop consumer awareness of their product line. (Id.)

Ansell's "LIFESTYLES" branded products are marketed through chain drug stores and retailers. (Pl. Br. at 7.) Ansell has promoted their new "4PLAY" line at drug store industry trade

shows which are also attended by Trimensa's current customer, Walgreens.  Id.  Ansell also has begun marketing their "4PLAY" line of products to retailers of adult-oriented products, some of whom also carry Trimensa's products, as well as to brokers and distributors who then re-sell Ansell's products through other outlets.  (Id.)  In contrast to Trimensa's approach, Ansell spends "substantial sums of money" to advertise and promote its "LIFESTYLES" mark, (Def. Br. at 7), and plans to make substantial promotional expenditures to build consumer awareness in support of the launch of its new "4PLAY BY LIFESTYLES" brand.  (Ogilvie Decl. at Ex. 13.)

### III. Conclusions of Law

Trimensa has filed a motion for preliminary injunction against Ansell to stop them from using terms that allegedly infringe upon Trimensa's "FORPLAY SENSUAL LUBRICANTS" mark in the packaging and advertising for Ansell's new "4PLAY BY LIFESTYLES" line of condoms.

A.    Preliminary Injunction Standard

The decision of whether to grant a preliminary injunction is within the discretion of the District Court.  United States v. Price, 688 F.2d 204, 210 (3d Cir. 1982).  When deciding a motion for preliminary injunction under Rule 65(a), the Court must consider four factors:

> (1) whether the movant has shown a likelihood of success on the merits; (2) whether the movant will be irreparably injured by denial of relief; (3) whether granting preliminary relief will result in even greater harm to the nonmoving party; and (4) whether granting the preliminary relief will be in the public interest.

Times Mirror Magazines, Inc. v. Las Vegas Sports News, L.L.C., 212 F.3d 157, 160 (3d Cir. 2000), cert. denied, 531 U.S. 1071 (2001).  Granting an injunction is an extraordinary measure that should only be done in limited circumstances.  AT&T v. Winback & Conserve Program, 42

F.3d 1421, 1426-27 (3d Cir. 1994).  In trademark cases, a District Court should grant such relief only where the plaintiff has carried its burden on <u>each</u> of the aforementioned factors.  <u>See Opticians Ass'n of Am. v. Independent Opticians of Am.</u>, 920 F.2d 187, 191 (3d Cir. 1990).  Because the Court has not found sufficient evidence presented by the Plaintiff to sustain a finding on the first factor, namely that they are likely to succeed in their case on the merits, the Plaintiff has not sustained their burden necessary to justify a preliminary injunction.

B.      <u>Likelihood of Success on the Merits</u>

Plaintiff Trimensa alleges that Ansell's use of the "4PLAY BY LIFESTYLES" mark constitutes federal trademark infringement, false designation of origin, and unfair competition under 15 U.S.C. §§ 1114 and 1125(a) (Claim for Relief I and II) and unfair competition under New Jersey statutory and common law (Claim for Relief III).

1.      <u>Federal Claims Under the Lanham Act</u>

"'The law of trademark protects trademark owners in the exclusive use of their marks when use by another would be likely to cause confusion.'"  <u>Commerce Nat'l Ins. Servs. v. Commerce Ins. Agency, Inc.</u>, 214 F.3d 432, 437 (3d Cir. 2000) (quoting <u>Interspace Corp. v. Lapp Inc.</u>, 721 F.2d 460, 462 (3d Cir. 1983)).  Federal trademark infringement claims, 15 U.S.C. § 1114, and federal unfair competition claims, 15 U.S.C. § 1125(a)(1)(A), are measured by identical standards.  <u>See A & H Sportswear, Inc. v. Victoria's Secret Stores, Inc.</u>, 237 F.3d 198, 210 (3d. Cir. 2000).  In both cases, a plaintiff needs to prove:

> (1) that it has a valid and legally protectable mark; (2) it owns the mark; and (3) the defendant's use of the mark to identify goods or services causes a likelihood of confusion.

<u>Id.</u> at 210 (citing <u>Commerce Nat'l</u>, 214 F.3d at 437).

6

(a)     Validity and Protectability of the Plaintiff's Mark

If the mark at issue in an infringement case is federally registered and has become

incontestable, then validity and protectability are proved as a matter of course.  See Commerce

Nat'l, 214 F.3d at 438.  It is undisputed that Trimensa owns the "FORPLAY SENSUAL

LUBRICANTS" mark and associated design and that this is a valid and legally protectable

mark.[5]  Trimensa, however, is also claiming protection for the standalone mark "FORPLAY,"

which has not yet received federal registration.  (Pl. Br. at 15)  Where a mark has not been

federally registered or, if registered, has not achieved incontestability, its validity depends on

proof of secondary meaning unless the unregistered mark is deemed inherently distinctive.  See

Commerce Nat'l, 214 F.3d at 438 (quoting Ford Motor Co. v. Summit Motor Products, 930 F.2d

277, 292 (3d Cir. 1991)).

Trademark law recognizes varying types of marks, typically grouped into four categories:

(1) generic; (2) descriptive; (3) suggestive; and (4) arbitrary or fanciful.  A & H Sportswear, 237

F.3d at 221-22.  The "suggestive" and "arbitrary or fanciful" categories are deemed inherently

distinctive and, therefore, entitled to legal protection.  Fisons Horticulture v. Vigoro Indus., 30

F.3d 466, 472 (3d Cir. 1994) (citing Ford Motor Co., 930 F.2d at 291).  See also Commerce

Nat'l, 214 F.3d at 438 n. 5 (citing Ford Motor Co., 930 F.2d at 292 n. 18) ("A mark can be

inherently distinctive if it may be fairly characterized as arbitrary, fanciful, or suggestive.")

---

[5]     A trademark is deemed incontestable after: (1) the owner files affidavits stating
that the mark has been registered; (2) the mark has been in continuous use for five consecutive
years subsequent to registration; (3) there are no pending proceedings contesting the owner's
rights to registration; and (4) there have been no adverse decisions concerning the registrant's
ownership or right to registration.  Fisons Horticulture v. Vigoro Indus., 30 F.3d 466, 472 n.7 (3d
Cir. 1994).

The Court accepts, for the purposes of this analysis, Trimensa's claim that they will be able to demonstrate at trial that their "FORPLAY" mark is suggestive, rather than merely descriptive. A descriptive mark describes the purpose, function or use of a product. See 2 J. Thomas McCarthy, McCarthy on Trademarks and Unfair Competition, § 11:16 (4th ed. June 2004). A suggestive mark, by comparison, requires consumer "imagination, thought or perception" to determine what the product is. A & H Sportswear, 237 F.3d at 222. Both Trimensa's "FORPLAY" and Ansell's "4PLAY" marks are intended to evoke the phonetically identical term "foreplay" - creating a suggestive image in the consumer's mind regarding the intended use of these respective products. See, e.g., A&H Sportswear, 237 F.3d at 223 ("MIRACLE SUIT" is suggestive for bathing suits); Fissons Horticulture, 30 F.3d at 466 ("FAIRWAY" is suggestive for peat moss). As a suggestive mark, Trimensa is entitled to some degree of trademark protection for both their "FORPLAY" mark and their federally registered "FOREPLAY SENSUAL LUBRICANT" mark with its associated design.

(b)     Likelihood of Direct Confusion

To prevail on its claim of infringement, Trimensa must show that there is a likelihood of confusion between their "FORPLAY" branded products and the "4PLAY" branded products being marketed by Ansell. Likelihood of confusion is a question of fact. Checkpoint Sys. Inc. v. Check Point Software Techs., Inc., 269 F.3d 270, 301 (3d Cir. 2001) (citing A & H Sportswear, 237 F.3d at 237). Confusion exists "'when the consumers viewing the defendant's mark would probably assume that the product or service it represents is associated with the source of a different product or service identified by a similar mark.'" Ford Motor Co., 930 F.2d at 292 (quoting Scott Paper Co. v. Scott's Liquid Gold, Inc., 589 F.2d 1225, 1229 (3d Cir. 1978)). The

Third Circuit has consistently analyzed certain factors, known as the "Lapp factors," in

determining whether there is a likelihood of confusion between marks. See A & H Sportswear,

237 F.3d at 211 (citing Interspace Corp. v. Lapp, Inc., 721 F.2d 460, 463 (3d Cir. 1983).  These

factors include, but are not limited to:

> (1) the degree of similarity between the owner's mark and the alleged
> infringing mark;
> (2) the strength of the owner's mark;
> (3) the price of the goods and other factors indicative of the care and attention
> expected of consumers when making a purchase;
> (4) the length of time the defendant has used the mark without evidence of
> actual confusion arising;
> (5) the intent of the defendant in adopting the mark;
> (6) the evidence of actual confusion;
> (7) whether the goods, though not competing, are marketed through the same
> channels of trade;
> (8) the extent to which the targets of the parties' sales efforts are the same;
> (9) the relationship of the goods in the minds of consumers because of the
> similarity of function;
> (10) other facts suggesting that the consuming public might expect the prior
> owner to manufacture a product in the defendant's market, or that he is likely
> to expand into that market.

Id.  "None of these factors is determinative in the likelihood of confusion analysis and each

factor must be weighed against the other. . . . [T]he different factors may properly be accorded

different weights depending on the factual setting.  A district court should utilize the factors that

seem appropriate to a given situation."  KOS Pharms., Inc. v. Andrx Corp., 369 F.3d 700, 709

(3d Cir. 2004).

      (1)    Degree of Similarity Between the Two Marks

"The single most important factor in determining likelihood of confusion is mark

similarity."  Id. at 712-13 (emphasis added).  The Plaintiff argues that Ansell's use of the term

"4PLAY" will be construed by the public as the phonetically identical, but fictitious word

"forplay."  (Pl. Br. at 15.)  (See also Tr. at 13, lines 17-25 (arguing numerical 4-p-l-a-y is

identical to f-o-r-p-l-a-y rather than dictionary term f-o-r-e-p-l-a-y).)  This phonetic similarity,

Trimensa argues, infringes upon their legally protected "FORPLAY" mark.  (Id.)  The Plaintiff's

assumption that Ansell's use of the numerical "4" in their mark will necessarily be viewed by the

public as a substitute for the word "for" is a broad one.  The Court finds no reason to presume

that someone viewing the "4PLAY" mark is more likely to read the "4" as a phonetic substitute

for "for" than for one of the other phonetically identical words such as "four" or "fore," or even

read at face value as the numeric "4."  Given the nature of the product and its intended use, it

seems far more likely that the public will read this as a phonetic for the dictionary word

"foreplay," as opposed to an attempt to copy the Plaintiff's fanciful term "FORPLAY" (which is,

itself, a phonetic for the word "foreplay").

> Both Trimensa's and Ansell's marks are a phonetic play on words to suggest the word

"foreplay."  Use of a phonetically identical term can, in some circumstances, result in sufficient

similarity between two marks to find trademark infringement.  See, e.g., Banff Ltd. v. Federated

Dept. Stores, 841 F.2d 486, 490 (2d Cir. 1988) (finding phonetically identical marks "B WEAR"

and "BEE WEAR" confusingly similar).  The difficulty with the Plaintiff's claim, however, is

that they are claiming that Ansell's "4PLAY" mark is phonetically identical to their

"FORPLAY" mark, while their "FORPLAY" mark is itself a phonetic substitute for the general

term "foreplay" - a term which Trimensa admits they have no sustainable claim of protection for.

(See Tr. at 15, lines 2-7.)  At oral argument, Plaintiff's counsel conceded that, had Ansell used

the word f-o-r-e-p-l-a-y, rather than the numeric concoction 4-p-l-a-y, in their branding, "[w]e

would not be in court here."  (Id.)  (See also id. at 18, lines 16-18 (plaintiff's counsel noting that

10

"we don't have a problem with [use of] the dictionary word [foreplay]").)  If, therefore, Ansell's mark were to be construed as a phonetic equivalent of the term "foreplay," as the Court believes it is likely to be, rather than a phonetic for the fanciful term "FORPLAY," Trimensa would, by their own admission, have no actionable claim.

Any confusion arising from the similar sound of the marks "FORPLAY" and "4PLAY" is further abated by the dramatic difference in appearance between the way the two marks are presented to the consumer.  Such differences may be sufficient to distinguish marks, when like-sounding marks are taken in the context as the consumer sees them.  See, e.g., Streetwise Maps, Inc. v. VanDam, Inc., 159 F.3d 739, 745 (2d Cir. 1998) (noting that similar sounding names is not necessarily determinative of confusingly similar trademarks).

Trimensa's products feature either: (1) a graphic depiction of the word "FORPLAY," consisting of the word "For" (with a capital "F") combined with the word "Play" (with a capital "P") in a horizontal line across the packaging along with a distinctive design element under the word; or (2) the registered "FORPLAY SENSUAL LUBRICANT" with their accompanying design mark.  (Ogilvie Decl. at Ex. 1-2.)  Ansell's products, by comparison, employ a distinctive graphical design, featuring a large "4" written horizontally in the upper right corner of the package, accompanied by the word "Play" written vertically down the center of the packaging with the additional wording "by LifeStyles®" in a graphic circle at the lower left corner of the package.  (See Pl. Br. at Ex. B)

Due to the nature of the buying decision that is predominant in the market for these products, the differences in visual impression between the two marks is particularly relevant. Condoms are generally offered for sale on self-serve shelves.  (Def. Br. at 23.)  The purchase

decision for these products is aptly described as a "spontaneous" purchase.  (Pl. Br. at 8.)  When many buyers go to the store to purchase condoms, they are often embarrassed, and make a rushed purchase decision since, as Trimensa notes in their brief, "[c]ustomers don't want to be seen shopping in the condom category."  (Id.)  This reduces the average customer decision process in selecting a desired product to 12 seconds or less at the aisle display where condoms are sold.  (Id.)  This hurried decision process favors visual presentation, rather than phonetic representations, as the deciding factor in a buyer's selection among competing products.

Ansell's use of the house mark "BY LIFESTYLES" in its composite mark further minimizes any risk of confusion with Trimensa's use of "FORPLAY" for sexual lubricants.  "LIFESTYLES" is a well-known house mark in the condom market,[6] and supported by significant advertising expenditures to support consumer awareness of the brand.  (Def. Br. at 7.)  Use of such a strong house mark in conjunction with otherwise similar marks can work to lessen the likelihood of confusion.  See, e.g., A & H Sportswear, Inc., 237 F.3d at 218 ("affixing a well-known house mark like that of Victoria's Secret can help diminish the likelihood of confusion"); Commerce Bancorp, Inc. v. Bankatlantic, 285 F.Supp.2d 475, 493 (D.N.J. 2003) (finding otherwise similar marks distinct because the marks were "always in combination with a house mark which distinguishes them").

For these reasons, the Court finds that the first Lapp factor, similarity between the marks, weighs heavily in favor of the Defendant.

(2)    Strength of the Owner's Mark

---

[6]    In 2001, Ansell's "LIFESTYLES" brand condom sales represented 12% of the worldwide condom market.  (Pl. Br. at 33.)

Under the Lanham Act, stronger marks receive greater protection since they carry greater recognition, making a similar mark more likely to cause confusion.  KOS Pharms., 369 F.3d at 715.  The strength of an owner's mark is a measure of that mark's distinctiveness, or the tendency for a mark to identify the products or services sold under the mark as "emanating from a particular, although possibly anonymous, source."  Accu Personnel v. AccuStaff, Inc., 823 F.Supp 1164, 1165 (D.Del. 1993) (citing McGregor-Doniger, Inc. v. Drizzle, Inc., 599 F.2d 1126, 1131 (2d Cir. 1979)).  Evaluation of a mark's strength requires a court to examine both the conceptual and commercial aspects of its strength.  See Rockland Mortgage Corp. v. Shareholders Funding, Inc., 835 F.Supp. 182, 193 (D.Del. 1993).

    i.    Conceptual Strength of the Plaintiff's Mark

As mentioned in the discussion supra, the Court has presumed, for purposes of this analysis, that the mark "FORPLAY" is suggestive and entitled to some degree of trademark protection.  "FORPLAY," however, is used as a phonetic equivalent of the term "foreplay" - a term that, along with its phonetic equivalents, is not particularly distinctive in the adult products marketplace.  "Suggestive or arbitrary marks may, in fact, be 'weak,' particularly if they are used in connection with a number of different products."  A & H Sportswear, 237 F.3d at 222.  Even use of a similar mark in other markets may undermine the strength of a mark.  Id. at 223 (noting use of "MIRACLE" by other apparel manufacturers, even those not making swim wear, undermines finding strong mark for "MIRACLE" mark used in swim wear).

The Defendant provided numerous examples of variations on the word "foreplay" used in branding a wide variety of adult products.  (Def. Br. Appx. at Ex. 2.)  For example, "Fourplay.com" and "Foreplay.com" are both websites featuring adult products for sale,

including both condoms and personal lubricants.  (Id.)  Other similar uses in the marketplace include "4 Play" lingerie, "For ❤ Play" lubricants, etc.  (Id.)  Such extensive third party use of the word "foreplay" and its various phonetic equivalents weighs heavily against a finding that the Plaintiff's unregistered "FORPLAY" brand is conceptually strong.  See Citizens Fin. Group, Inc. v. Citizen's Nat'l Bank of Evans City, 383 F.3d 110, 123 (3d Cir. 2004) ("as a general rule, widespread use of even a distinctive mark may weaken the mark"); Fissons Horticulture, 30 F.3d at 479 (noting that third party registrations and usage "make the mark less strong if they were in the same market"); Taj Mahal Enter. Ltd. v. Trump, 745 F.Supp. 240, 248 (D.N.J. 1990) ("the widespread use of a given mark by others weakens the mark and dilutes the plaintiff's protection").

    ii.    Commercial Strength of the Plaintiff's Mark

The Plaintiff notes that they have been using the "FOREPLAY" mark on their products for twenty five years.  (Pl. Br. at 20.)  During this time, however, the products were supported only by a "modest advertising budget" and relied primarily on "word of mouth" advertising.  (Pl. Reply Br. at 8.)[7]  The primary retail channels for Trimensa's products are drug retailer Walgreens and retail stores that feature 'adult-oriented' products.  (Pl. Br. at 4.)  These limited expenditures and narrow distribution channels weigh against a finding that Trimensa possesses a commercially strong mark.

For these reasons, the Court finds that the second Lapp factor, strength of the owner's

---

[7]    Trimensa's total advertising and promotional expenditures to support the "FORPLAY" brand for the four year period between 2001 to 2004 have totaled only $562,900. (Pl. Br. at 4.)  This is compared to a planned annual promotional spending of $4,000,000 by Ansell to support their "4PLAY" and "Sustain for Men" products in the first year of market introduction.  (Ogilvie Decl. at Ex. 13.)

mark, weighs in favor of the Defendant.

       (3)     Other Lapp Factors

The other Lapp factors must also be considered and weighed in considering the Plaintiff's claims.  The third Lapp factor weighs in favor of the Plaintiff.  Condoms are relatively low cost products, and are purchased through a somewhat hurried decision making process.  (Pl.'s Memorandum at 8.)  For products such as this, consumers are held to a lower standard of care and the likelihood of confusion may be increased.  See Versa Products Co. v. Bifold Co., 50 F.3d 189, 203 (3d Cir. 1995).

The fourth and sixth Lapp factors, however, weigh in favor of the Defendant.  Ansell launched its "4PLAY" line of products in March 2005.  (Def. Br. at 8.)  Despite this, Trimensa has not put forth any evidence of actual confusion in the marketplace.  (See tr. at 18, lines 11-13 (Plaintiff's counsel noting that "as of this point, no, we don't have the classic purchaser actual confusion evidence).)  The Court agrees with Plaintiff's claims that it is likely that any incidents of actual confusion may have evaded Trimensa's notice given the limited time that Ansell's products have been in the marketplace and the low cost of the products at issue.  This was taken into consideration by the Court in determining the relative weight to place on factors four and six in deliberating the likelihood of direct confusion.

The fifth Lapp factor, intent of the defendant in adopting the mark, also weighs in favor of the Defendant.  Trimensa, in their brief, aptly notes that "'intentional, willful and admitted adoption of a mark closely similar to the existing marks' weighs strongly in favor of finding a likelihood of confusion.'"  Checkpoint, 269 F.3d at 286 (quoting National Football League Props., Inc. v. New Jersey Giants, Inc., 637 F.Supp. 507, 518 (D.N.J. 1986)).  "[D]efendant's

intent, [however,] will indicate a likelihood of confusion only if an intent to <u>confuse</u> consumers is demonstrated via purposeful manipulation of the junior mark to resemble the senior's." <u>A & H Sportswear</u>, 237 F.3d at 226 (citing <u>Versa Prods. Co. Inc. v. Bifold Co. (Mfg.) Ltd.</u>, 50 F.3d 189, 205-06 (3d Cir. 1995) (emphasis in original)).

Trimensa notes that, due to prior dealings between the two companies, some individuals at Ansell were doubtlessly aware of Trimensa's "FORPLAY" mark.  (Ogilvie Decl. ¶ 11, Ex. 7.) The Defendant, however, presented evidence that the persons at Ansell directly responsible for the development of the "4PLAY" brand had neither heard of Trimensa's "FORPLAY" products nor knew of any prior dealings between Trimensa and Ansell.  (Lutz Decl.¶ 14, Garland Decl. ¶ 5, and Monroe Decl. ¶ 2)  Such evidence weighs in favor of the Defendant in concluding that Ansell's expansion of its "LIFESTYLES" product line with the "4PLAY" branded products was not driven by an improper motivation to infringe on Trimensa's trademarks.  <u>See</u> <u>A & H Sportswear</u>, 237 F.3d at 226 (noting that where evidence is presented by defendant that noone responsible for brand development heard of allegedly infringed brand, court may find brand expansion made for "legitimate reasons").

Furthermore, as noted <u>supra</u>, the use of the term "foreplay" or its various phonetic equivalents is not conceptually unique in the adult products marketplace.  This, coupled with a lack of confusing similarity between the two marks, makes it unlikely that Ansell's use of the "'4PLAY" mark can be properly deemed a "reckless [or] at worst deliberate appropriation of the good will [Plaintiff] had generated' from its FORPLAY products."  (Pl. Br. at 26 (quoting <u>Kos Pharmaceuticals, Inc. v. Andrx</u> Corp., 369 F.3d 700, 721-22 (3d Cir. 2004)).  This factor, therefore, is weighed in favor of the Defendant.

The seventh, eighth, ninth and tenth factors can be considered together.  Both Trimensa and Ansell's products are being marketed through the same channels of trade, namely adult stores and chain drug stores.  (Pl. Br. at 4 & 7.)  Personal lubricants and condoms have a close relationship in the marketplace.  Trimensa markets their products as "condom compatible" and Ansell has been marketing personal lubricants in conjunction with their "LIFESTYLES" condom line since 2000.  (Pl. Br. at 3.)  Given the similar target market and close relationship between Trimensa and Ansell's products, these factors weigh in favor of the Plaintiff.

Overall, however, the Court finds that the Lapp factors weigh in favor of Ansell.  As discussed supra, various Lapp factors are found to weigh in favor of each of the parties to this case.  The degree of similarity between the marks and the strength of the owner's mark, however, were determinative factors in the Court's analysis.  These factors weigh so strongly in favor of the Defendant that they were sufficient to overcame any remaining Lapp factors that may favor the Plaintiff's case.  The Court concludes, therefore, that the Plaintiff has not met their burden of proof for the third element required for trademark infringement under a direct confusion claim - namely that Ansell's use of the "4PLAY BY LIFESTYLES" mark is likely to create direct confusion concerning the true origin of Ansell's products.

(c)    Likelihood of Reverse Confusion

Trimensa also claims that Ansell's use of the "4PLAY BY LIFESTYLES" mark will create reverse confusion.  Reverse confusion is recognized in the Third Circuit as a distinct claim under the Lanham Act.  A & H Sportswear, 237 F.3d at 227.  Reverse confusion occurs when "a larger, more powerful company uses the trademark of a smaller, less powerful senior owner and thereby causes likely confusion as to the source of the senior user's goods or services."  Fisons,

17

30 F.3d at 474.  "As in a direct confusion claim, the proper inquiry in these cases is whether there is a likelihood of consumer confusion as to the source or sponsorship of a product."  A & H Sportswear, 237 F.3d at 229 (citing Fisons, 30 F.3d at 475).  To facilitate this determination, a similar test is applied, involving many of the same factors as the Lapp test:

> (1) the degree of similarity between the owner's mark and the alleged infringing mark;
> (2) the strength of the two marks, weighing both a commercially strong junior user's mark and a conceptually strong senior user's mark in the senior user's favor;
> (3) the price of the goods and other factors indicative of the care and attention expected of consumers when making a purchase;
> (4) the length of time the defendant has used the mark without evidence of actual confusion arising;
> (5) the intent of the defendant in adopting the mark;
> (6) the evidence of actual confusion;
> (7) whether the goods, though not competing, are marketed through the same channels of trade;
> (8) the extent to which the targets of the parties' sales efforts are the same;
> (9) the relationship of the goods in the minds of consumers, whether because of the near-identity of the products, the similarity of function, or other factors;
> (10) other facts suggesting that the consuming public might expect the larger, more powerful company to manufacture both products, or expect the larger company to manufacture a product in the plaintiff's market, or expect that the larger company is likely to expand into the plaintiff's market.

A & H Sportswear, 237 F.3d at 229.  Several factors in a reverse confusion claim are analyzed in the same way as they are for a direct confusion claim.  Factors (3), (7), (8) and (9) are analyzed "no differently in the reverse confusion context."  A & H Sportswear, 237 F.3d at 229.

   (1)   Similarity of the Marks

In general, the similarity between marks is examined in the same way for both direct and reverse confusion analysis.  Id.  The evaluation of the impact of the house mark, however, is different under a reverse confusion claim than under direct confusion analysis.  Id.  Consistent with the nature of reverse confusion claims, where a junior mark is accompanied with a strong

18

house mark, there is a danger that when consumers encounter the senior mark, they will associate it with the junior user's house mark as well.  Id.  In some cases, a strong house mark can aggravate, rather than mitigate, reverse confusion by reinforcing the association of the contested brand with the junior mark's house mark.  Id. at 230.

Ansell has noted that they spend "substantial sums of money" to advertise and promote its "LIFESTYLES" mark, making it a strong brand within the condom market.  (Def. Br. at 7.) Were the contested marks more similar, there may be a danger of consumers associating Trimensa's "FORPLAY" products with Ansell's "LIFESTYLES" house mark, incorrectly believing that Trimensa's products are manufactured by Ansell.  Due to the distinct visual appearance of the two marks and the common use of the term "foreplay" and its various phonetic equivalents in the marketplace, however, the Court is satisfied that the two marks are sufficiently distinct to distinguish them - even with Ansell's strong house mark.

(2)    Strength of the Marks

Another important difference in the analysis between direct and reverse confusion claims is the evaluation of the relative strengths of the marks.  A & H Sportswear, 237 F.3d at 230.  Like direct confusion claims, this factor requires examination of both the commercial and conceptual strength of the mark.  Id.

i.    Commercial Strength

In reverse confusion analysis, the Court looks at the commercial disparity between the holders of the two marks.  "Where the greater advertising originates from the senior user, we are more likely to see a case of direct confusion; if the greater advertising originates from the junior user, reverse confusion is more likely."  Id. (citing 3 McCarthy, supra, § 23:10, at 23-32).

19

Here, Trimensa claims that Ansell's planned advertising expenditures to promote their "4PLAY" products will dwarf their own expenditures in support of the "FORPLAY" brand. (Pl. Br. at 8.) Trimensa's total advertising and promotional expenditures to support the "FORPLAY" brand from 2001 to 2004 have totaled only $562,900. (Pl. Br. at 4.) According to Ansell's literature to prospective distributers, Ansell plans to spend $4,000,000 in promotional spending on their "4PLAY" and "Sustain for Men" products in the first year of market introduction. (Ogilvie Decl. at Ex. 13.) The disparity between the relative commercial strength of the marks here clearly weighs in favor of the Plaintiff.

    ii.    Conceptual Strength

The conceptual strength of the mark is evaluated in the same manner for a reverse confusion as for a direct confusion case - with a conceptually strong mark weighing in the senior user's favor. A & H Sportswear, 237 F.3d at 231 (citing Worthington Foods, Inc. v. Kellogg Co., 732 F.Supp. 1417, 1456 (S.D. Ohio 1990)). Here, for the reasons discussed supra, the Court notes that the "FORPLAY" mark is not conceptually strong in this market. Therefore, the conceptual strength of the mark weighs in favor of the Defendant.

    (3)    Intent of the Defendant

If a defendant adopts a mark with the intent to confuse the marketplace as to the product's source, it would be relevant to a reverse confusion analysis in the same manner as it would for a direct confusion claim. A & H Sportswear, 237 F.3d at 232 (citing Versa Prods. Co. Inc. v. Bifold Co. (Mfg.) Ltd., 50 F.3d 189, 205 (3d Cir. 1995)). As discussed supra in the Court's evaluation of Trimensa's direct confusion claim, there has been no evidence presented to support a conclusion that Ansell adopted the "4PLAY" mark with an intent to confuse the marketplace as

to the source of either Ansell's or Trimensa's products, this factor weighs in favor of the Defendant.

(4)     Factors Relating to Actual Confusion

Factors (4) and (6) may properly be considered together to see if the Plaintiff has presented evidence of consumer confusion that may be relevant to their reverse confusion claim. As discussed supra in evaluating this factor for Trimensa's direct confusion claim, Trimensa has presented no evidence of actual consumer confusion for either the direct or reverse confusion claims, but the Court recognizes the inherent difficulty of obtaining such evidence in evaluating the relative weight given to this factor.

(5)     Other Relevant Facts

In evaluating a reverse confusion claim, the Third Circuit directs District Courts to examine any "other facts suggesting that the consuming public might expect the larger, more powerful company to manufacture both products, or expect the larger company to manufacture a product in the plaintiff's market, or expect that the larger company is likely to expand into the plaintiff's market."   A & H Sportswear, 237 F.3d at 234 (citing Fisons, 30 F.3d at 480).

As noted in the discussion supra regarding the market for these products, it is likely that a consumer might expect Ansell to produce both condoms and personal lubricants, as it has done since 2000. (Pl. Br. at 5.)  Given the interrelated nature of the two products, it is similarly reasonable that a consumer may expect Trimensa to manufacture condoms, in addition to its line of personal lubricants.[8]  These factors weigh in favor of the Plaintiff in assessing their reverse

---

[8]     Trimensa alleges that they were preparing to expand their product line to include condoms under the "FORPLAY" brand this year, but put the product launch on hold pending the outcome of this litigation.  (Pl. Br. at 2.)

confusion claim.

Overall, however, the Court finds that these factors weigh in favor of Ansell. As discussed supra, the degree of similarity and the strength of the marks at issue are critical factors in the Court's analysis. Again, both of these factors weigh strongly in favor of the Defendant. The Court is satisfied that the visual distinctiveness of Ansell's mark and the conceptual weakness of Trimensa's mark are sufficient to outweigh any remaining factors favoring a showing of reverse confusion. Because Trimensa could not show a likelihood of reverse confusion from the two marks, they have failed to prove the third element required for trademark infringement under the reverse confusion doctrine - namely that Ansell's use of the "4PLAY BY LIFESTYLES" mark is likely to create reverse confusion concerning the true origin of Trimensa's "FORPLAY" branded products.

### 2.    Remaining Common Law and State Law Claims

The elements required to prevail on common law trademark infringement and unfair competition, and New Jersey statutory unfair competition (Claim for Relief III), are identical to those required by federal law under the Lanham Act.[9]  See N.J. Stat. § 56:3-13a; Pharmacia Corp. v. Alcon Laboratories, 201 F.Supp.2d 335, 386 (D.N.J. 2002).  See also J&J Snack Foods Corp.

---

[9]    New Jersey state law provides that "State trademark registration and protection [are] substantially consistent with the federal system of trademark registration and protection under the federal Trademark Act of 1946, 15 U.S.C. 1051 et seq.  The interpretation and construction of the federal Trademark Act of 1946 shall be examined as persuasive authority for the interpretation and construction of this 1995 amendatory and supplementary act."  N.J. Stat. § 56:3-13a.  In the Third Circuit, the test for common law infringement and unfair competition is similarly identical to the federal test.  Pharmacia Corp. v. Alcon Laboratories, 201 F.Supp.2d 335, 386 (D.N.J. 2002) (citing Apollo Distrib. v. Jerry.Kurtz Carpet Co., 696 F.Supp. 140, 143 (D.N.J. 1988)).

v. Nestle USA, Inc., 149 F.Supp.2d 136, 157 (D.N.J. 2001); Apollo Distrib. v. Jerry Kurtz Carpet Co., 696 F.Supp. 140, 143 (D.N.J. 1988).  Because the Court has found that Trimensa is unlikely to succeed on the merits of its federal claims, it similarly finds that they are unlikely to succeed on the remaining state and common law claims for trademark infringement and unfair competition.

### IV. Conclusion

For the reasons stated above, Trimensa has failed to establish its claim under either federal or state law.  Consequently, the Defendant's Motion for a Preliminary Injunction is **denied**.

An appropriate form of order will be filed herewith.


Dated: September 26, 2005                           /s Stanley R. Chesler, U.S.D.J.

Stanley R. Chesler, U.S.D.J.